[Cite as *State ex rel. Atty. Gen. of Ohio v. State Line Agri, Inc.*, 2011-Ohio-2191.]

IN THE COURT OF APPEALS FOR DARKE COUNTY, OHIO

STATE OF OHIO, ex rel., ATTY.　　　　:
GENERAL OF OHIO

　　　　Plaintiff-Appellee　　　　　　:　　　　C.A. CASE NO. 2010 CA 11

v.　　　　　　　　　　　　　　　　　:　　　　T.C. NO.　　08CV64753

STATE LINE AGRI, INC., et al.　　　　:　　　　(Civil appeal from
　　　　　　　　　　　　　　　　　　　　　　Common Pleas Court)

　　　　Defendants-Appellants　　　　:

　　　　　　　　　　　　　　　　　:

　　　　　　　　. . . . . . . . .

**O P I N I O N**

Rendered on the　　6th　　day of　　May　　, 2011.

　　　　　　　　. . . . . . . . .

AARON S. FARMER, Atty. Reg. No. 0080251 and MARGARET A. MALONE, Atty. Reg. No. 0021770 and ERICA M. SPITZIG, Atty. Reg. No. 0085536, Assistant Attorneys General, Environmental Enforcement Section, 30 East Broad Street, 25th Floor, Columbus, Ohio 43215
　　　　Attorneys for Plaintiff-Appellee

JACK A. VAN KLEY, Atty. Reg. No. 0016961, 132 Northwoods Blvd., Suite C-1, Columbus, Ohio 43235
　　　　Attorney for Defendants-Appellants

　　　　　　　　. . . . . . . . .

FROELICH, J.

{¶ 1} State Line Agri, Inc., Rick L. Kremer, and Neal Kremer appeal from a judgment of the Darke County Court of Common Pleas, which found that they had violated Ohio's Livestock Environmental Permitting Program (LEPP) statute, Ohio's

Water Pollution Control Act, and the permits issued to State Line Agri under those statutes. The court assessed civil penalties and ordered injunctive relief for those violations. For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings.

I

{¶ 2} State Line Agri, Inc. ("SLA") is a livestock company that operates two hog confinement facilities in Ohio, one in Darke County and the other in Mercer County. The company is owned equally by Rick Kremer and his spouse; Rick Kremer is solely responsible for operational and management decisions regarding corporate matters. SLA employs various individuals to oversee daily operations and to complete required tasks assigned by Mr. Kremer. SLA's employees included Richard Fisher, who was charged to oversee record keeping and administrative duties, Darrell Newman, and Kyle Stegall. Two of Rick Kremer's sons, Neal Kremer and Roman Kremer, also worked for SLA.

{¶ 3} The facility in Darke County ("the Ansonia facility") is located at 9159 State Route 118, south of Ansonia, Ohio, and is in the Stillwater River watershed. The Ansonia facility raises approximately 4,400 hogs from feeder pig size to market weight. Based on the size of this facility and the number of buildings, the Ansonia facility was subject to regulation by the Ohio Environmental Protection Agency ("Ohio EPA") and the Ohio Department of Agriculture ("ODA"); the regulations are set forth in the Ohio's Water Pollution Control Act (R.C. Chapter 6111), Ohio's Livestock Environmental Permitting Program (LEPP) statute (R.C. Chapter 903), and the Ohio Administrative Code. The implementation of these regulations is

documented in extensive documents known as the Permit to Operate ("PTO") approved by the ODA and the National Pollution Discharge Elimination System ("NPDES") permit approved by the Ohio EPA. The regulatory purposes include prevention of pollution into waters of the State of Ohio and promoting use of best farming management practices. Regulatory methods include both self-monitoring by the permittees and on-site inspections from regulators.

{¶ 4} Due to repeated manure storage pond overflows at the Ansonia facility in 2003, the Ohio EPA required SLA to submit an NPDES permit application. SLA was also informed of the need to apply for a PTO for the Ansonia Facility. PTO No. STA-0001.PO001.DARK was issued to SLA for the Ansonia facility on September 28, 2004. SLA ultimately submitted the required NPDES application, and the Ohio EPA issued NPDES Permit No. OHA000001, effective February 1, 2005.

{¶ 5} The facility in Mercer County ("the Celina facility") is west of Celina, Ohio, and is in the Wabash River watershed. Due to the smaller size of the facility, the Celina facility was not required to obtain an NPDES permit or a PTO.

{¶ 6} Stateline Resource Management, Inc. ("SLRM"), a company owned by Neal Kremer, performs manure application. "Manure application" includes spraying or spreading manure onto a land surface, injecting manure below the land surface into the crop root zone, and incorporating (i.e., mixing) manure into the soil with standard agricultural practices. SLRM pumps liquid manure from storage ponds or lagoons and sprays the manure onto the fields. Neal Kremer operated SLRM as a sole proprietorship under the SLRM trade name until it became a

limited liability company on September 14, 2007. Daily operational and management decisions for SLRM are made by Neal Kremer. Roman Kremer was employed by SLRM to spread manure and assist in the business of SLRM.

{¶ 7} On July 9, 2008, the Attorney General of the State of Ohio ("the State") filed a 23-count complaint against SLA, Rick Kremer, Neal Kremer, Roman Kremer, Richard Fisher, and SLRM (collectively, "Defendants"), seeking civil penalties under R.C. 903.16 and R.C. 6111.09 and injunctive relief for violations of the Ohio statutory and regulatory law, including the failure to comply with SLA's PTO and NPDES permit. Generally, the State alleged that there was a discharge from the Celina facility due to the land application of manure on November 29 and 30, 2006; that there were discharges of manure from the Ansonia facility in July 2003 and on February 28 and March 1, 2007; that the land application of manure on February 27 and 28, 2007, violated numerous regulations and provisions of SLA's permits; and that SLA and its employees violated permit provisions relating to inspections, operating records, disposal of mortality (dead animals), and maintenance of its manure storage ponds. The majority of the claims dealt with the land application of manure that occurred on February 27 and 28, 2007, with manure from the Ansonia facility. We will discuss the specific counts at issue in this appeal below. The State's complaint was brought on behalf of both the ODA and the Ohio EPA.

{¶ 8} On September 4, 2009, the State moved for summary judgment on liability against SLA, Rick Kremer, and Roman Kremer on various counts of its complaint. On the same date, Defendants moved for partial summary judgment on several claims relating to the discharges in July 2003, November 2006, and

February 27 and 28, 2007. The trial court sustained in part and overruled in part the motions for summary judgment, granting summary judgment to the State on certain counts and to Defendants on others. Again, the relevant portions of the trial court's decision will be discussed below.

{¶ 9} A bench trial on the remaining issues, including the appropriate injunctive relief and civil penalties for violations that Defendants had committed, was held in December 2009. On April 29, 2010, after considering the evidence and the parties' post-trial briefs, the trial court found SLA, Rick Kremer, Richard Fisher, and Neal Kremer to be liable on several counts. The court assessed civil penalties against SLA and Rick Kremer, totaling $68,900 ($37,000 for Ohio EPA violations and $31,900 for ODA violations); $4,400 against Neal Kremer ($1,700 for EPA violations and $2,700 for ODA violations); and $600 against Richard Fisher (all for ODA violations). The court suspended $60,000 of the fine against SLA and Rick Kremer on various conditions. The court ordered injunctive relief.

{¶ 10} SLA, Rick Kremer, and Neal Kremer (collectively, "Appellants") appeal from the trial court's judgment, raising eleven assignments of error. Richard Fisher did not file a notice of appeal.

II

{¶ 11} Appellants' first assignment of error states:

{¶ 12} "THE TRIAL COURT ERRED BY FINDING SLA AND RICK KREMER LIABLE FOR DISCHARGING MANURE INTO WATERS OF THE STATE UNDER COUNT TWO, BECAUSE THE DISCHARGE ALLEGEDLY RESULTED FROM AN SLA EMPLOYEE'S APPLICATION OF MANURE JUST BEFORE AND DURING

RAINFALL IN VIOLATION OF HIS EMPLOYER'S INSTRUCTIONS AND THUS OCCURRED OUTSIDE THE SCOPE OF THE EMPLOYEE'S EMPLOYMENT."

{¶ 13} In Count Two of the complaint, the State alleged that SLA, Rick Kremer, and Rich Fisher caused pollution to the Wabash River on November 30 and December 1, 2006, due to the land application of manure at the Celina facility on November 29 and 30, 2006, when rain was predicted for November 30, 2006, in violation of R.C. 6111.04 and 6111.07(A). After considering the evidence at trial, the trial court found that SLA caused manure to be spread onto land and that the manure was discharged into the Crab Branch tributary to the Wabash River, in violation of R.C. 6111.04, on November 30 and December 1, 2006. The court found SLA and Rick Kremer liable for the discharge.

{¶ 14} In their post-trial brief, SLA and Rick Kremer argued that they should not be liable for the discharge, because the employee who spread the manure, Darrell Newman, disregarded his employer's instruction not to apply the manure during unfavorable weather and was fired for doing so. The court did not specifically address Newman's conduct and the doctrine of respondeat superior liability in its decision and entry.

{¶ 15} "Under the doctrine of respondeat superior, a principal or employer may generally be held liable for tortious acts committed by its agents or employees if such acts occur within the scope of the employment relationship." *Pierson v. Rion*, Montgomery App. No. 23498, 2010-Ohio-1793, ¶44, citing *Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435, 438, 1994-Ohio-519. For an act to fall within the scope of employment, it must be "calculated to facilitate or promote

the business for which the [employee] was employed." *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 329. The existence of respondeat superior liability depends on the existence of control by a principal or employer over an agent or employee. *Natl. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, ¶20.

{¶ 16} In general, if an act is committed within the scope of employment, it will be authorized, either expressly or impliedly, by the employer. *Anousheh v. Planet Ford, Inc.*, Montgomery App. Nos. 21960, 21967, 2007-Ohio-4543, ¶45. "In that situation, the doctrine of *respondeat superior* liability will apply and the plaintiff need not prove ratification to hold the employer liable." *Fulwiler v. Schneider* (1995), 104 Ohio App.3d 398, 406. A plaintiff must show ratification only where the employee's actions are *outside* the scope of employment. Id.; *Anousheh* at ¶45.

{¶ 17} Intentional and willful acts by an agent or employee "to vent his own spleen or malevolence against the injured person" are generally outside the scope of employment. *Osborne*, 63 Ohio St.3d at 329. Stated differently, "an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶42, citing *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 59. However, willful or malicious conduct by an employee does not always remove the act from the scope of employment as a matter of law. *Anousheh* at ¶45. Rather, the act will remain within the scope of employment unless the act is so divergent that its very character severs the employment relationship. Id., citing 39 Ohio

Jurisprudence 3d, Employment Relations, § 404.

{¶ 18} Whether an employee is acting within the scope of his employment is a question to be decided by the trier of fact. *Osborne*, 63 Ohio St.3d at 330. "Only when reasonable minds can come to but one conclusion does the issue regarding scope of employment become a question of law." Id.

{¶ 19} In this case, Rick Kremer was in Florida on November 29 and 30, 2006. He testified that the manure lagoon at the Celina facility was full and that he gave instructions to SLA employees "that if the weather allows us and the neighbors' fields are ready, that we need to land apply" manure. Kremer did not specifically instruct that the manure be spread on November 29 and 30. On those dates, however, Darrell Newman, an SLA employee, land applied 250-300 gallons per minute of manure from the Celina facility over an eight to nine hour period.

{¶ 20} According to Christine Pence, an environmental livestock inspector for ODA LEPP, Rich Fisher (Operations Manager for SLA) told her during her investigation of the manure application that "the manure levels were getting high that fall, that typically they hire [a] custom manure applicator to come in and land apply the manure. However, that custom manure applicator wasn't able to get there and they were at the point where the manure levels were getting too full, and they had to get some manure out. They had just purchased manure application equipment, and *** they were trying to work out the bugs in the equipment trying to get it to work properly. And by the time they were able to get everything functioning, it was November the 29[th]."

{¶ 21} Rick Kremer terminated Newman's employment following the

November 2006 land application of manure. On January 13, 2007, Officer Ryan Garrison of the Ohio Department of Natural Resources served Rick Kremer with a citation for polluting waters of the State on November 30, 2006. Kremer pled guilty to the charge in the Celina Municipal Court and paid a fine.

{¶ 22} Appellants emphasize that Newman acted contrary to his employer's instructions by applying the manure during unfavorable weather and was fired for his conduct. These facts, however, do not mean that his conduct was outside the scope of his employment. Newman's employment included a responsibility to apply manure, and on November 30, 2006, he acted for the benefit of SLA when he applied the manure and lowered the level of manure in the full lagoon. Although the timing of his application was contrary to Rick Kremer's instructions, his actions were not self-serving, intended to "vent his own spleen," or "so divergent that its very character severs the employment relationship." To the contrary, even if the manner in which Newman applied the manure were unauthorized or contrary to SLA's policies, his actions were intended to promote or benefit the business for

{¶ 23} which he was employed. See *Grubb v. Security Natl. Bank and Trust Co.*, Clark App. No. 06-CA-1034, 2007-Ohio-1034 (concluding that a question of fact existed regarding whether a bank manager acted within the scope of his employment when, contrary to bank policy, he assaulted a customer while trying to eject her from the bank). Accordingly, the trial court reasonably concluded that Newman's conduct was within the scope of his employment and that SLA could be held liable for his conduct under the doctrine of respondeat superior.

{¶ 24} Appellants cite *State ex rel. Celebrezze v. Environmental Ents., Inc.*

(May 17, 1989), Hamilton App. No. C-880074, to support their assertion that Darrell Newman's application of manure just prior to and during rainfall was outside the scope of his employment and was not ratified by SLA. In *EEI*, a foreman for a hazardous waste transportation and disposal company disarmed the vapor monitoring system in the company's shredder room and started a forklift in that room, igniting the fumes and causing a fire in the shredder room. The foreman had started the forklift despite two warnings from the shredder operator (who was shredding aerosol cans with flammable materials) and the fact that the foreman had no indication of the vapor level in the room. The foreman's actions were contrary to EEI procedure, and he was fired for his conduct. The First District held that the actions of the foreman were neither authorized nor ratified by EEI and, therefore, the trial court had erred in holding EEI vicariously liable for the acts of its foreman.

{¶ 25} On appeal, the Supreme Court did not disturb the appellate court's ruling on this issue, stating: "As this case was tried to the court, and not a jury, we conclude that the court of appeals was clearly within its authority to reverse the trial court and enter judgment for EEI under App.R. 12(C) and, therefore, we affirm this portion of the appellate court's judgment. In doing so, we decline to make a determination regarding the weight of the evidence." *State ex rel. Celebrezze v. Environmental Ents., Inc.* (1990), 53 Ohio St.3d 147, 149.

{¶ 26} We disagree with the First District's analysis in *EEI*. In finding no vicarious liability, the First District focused exclusively on the facts that the foreman's actions were contrary to company policy and resulted in his termination; the decision did not discuss whether the actions facilitated EEI's business. In

addition, as we stated above, citing *Osborne*, the question of whether an employee acted within the scope of employment can be intensely factual, and with the evidence before it, the trial court did not err in finding SLA and Rick Kremer liable.

{¶ 27} The first assignment of error is overruled.

III

{¶ 28} Appellants' second assignment of error states:

{¶ 29} "THE TRIAL COURT ERRED BY FINDING UNDER COUNT TWO THAT THE DISCHARGE OF NOVEMBER 30, 2006 CONTINUED INTO THE NEXT DAY, BECAUSE THE TRIAL COURT COULD NOT RELY ON ERRONEOUSLY ADMITTED LAY OPINION ON THIS ISSUE AND BECAUSE THE STATE PRODUCED NO COMPETENT, CREDIBLE EVIDENCE OF SUCH A CONTINUING DISCHARGE."

{¶ 30} In their second assignment of error, Appellants claim that the trial court erred in allowing Cathy Alexander, an agricultural engineer employed by the Ohio EPA, to testify as a lay witness regarding the likelihood of continued manure discharge at the Celina facility on December 1, 2006. Appellants further argue that, even if her testimony were properly admitted, the State failed to offer any competent, credible evidence to prove that a discharge occurred on December 1, 2006.

{¶ 31} The State offered Alexander as an expert in agricultural engineering, including soil and water conservation and animal waste management, the Ohio EPA's rules relating to the regulation of concentrated animal feeding operations ("CAFOs") and NPDES permits, the requirements of the Ohio EPA general NPDES

permits and CAFOs, and requirements for properly addressing violations through injunctive relief. The court found Alexander to be an expert in all of those areas, except injunctive relief.

{¶ 32} During Alexander's testimony, she indicated that she had the opportunity to consider the relationship between the amount of rain that fell, the period of time over which rain fell, and how long it would have taken for the water to drain off the field. She further stated that she had reviewed State Exhibit 18, which indicated that it had rained beginning on Wednesday, November 29, 2006, continued into November 30, 2006, and also into December 1, 2006. The State then asked whether, based on Alexander's expertise, the discharge of manure would have continued on December 1, 2006. Defendants' counsel objected, arguing that the question asked for an expert opinion regarding the movement of water through soil, which required the expert opinion of a soil scientist or a hydrogeologist.

{¶ 33} Before ruling, the court inquired of Alexander whether she had performed this kind of analysis before and whether she had all of the necessary information. Alexander responded that she did not know the exact soil type on the field. The court sustained the objection, stating: "Soil type is one thing. I'm just thinking also about you got to know the moisture content before the whole thing starts. The problem being what do you do with extremely dry soil that absorbs a lot or partially saturated soil which has a different absorption rate than saturated soil."

{¶ 34} The State's counsel indicated that she would "come around at it a different way." The following exchange occurred:

{¶ 35} "Q.   When you look at the weather information, what did that tell you about how the progress of this entire storm event extended out over time?

{¶ 36} "A.   It showed that it continued to rain well into Friday [December 1] as far as I could tell from this because it's a very small picture.   But it appeared to have continued into Friday afternoon, early evening.

{¶ 37} "Q.   Why would that be important to know in whether or not it continued to discharge?

{¶ 38} "A.   Because if the tiles were already discharging Thursday afternoon when our inspectors were there and it continued to rain with no actual stopping other than at one point in time approximately 2:00 a.m. on Friday morning, the rest of the time it continued to rain, there's every reason to believe that that rain would continue to fill up that soil profile and continue to reach those drainage tiles either through short circuiting or through actual drainage through the soil profile.   It would be getting to those drainage tiles and continuing to leave the site."[1]

{¶ 39} At this point, Defendants' counsel moved to strike Alexander's testimony on the ground that she was not qualified as a soil scientist or a hydrogeologist to render that opinion.   The court overruled the objection, stating that it was allowing the testimony as "a lay expression of the flow of the water, not as an expert."

{¶ 40} Evid.R. 701 governs opinion testimony by lay witnesses.   It provides that, "[i]f the witness is not testifying as an expert, the witness' testimony in the form

---

[1] Tile drainage involves the use of pipes to remove excess water from the subsurface of the soil.

of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "Perception connotes sense: visual, auditory, olfactory, etc. Thus, opinion testimony under Evid. R. 701 must be based on firsthand, sensory based knowledge." *Sec. Natl. Bank & Trust Co. v. Reynolds*, Greene App. No. 2007 CA 66, 2008-Ohio-4145, ¶17.

{¶ 41} In contrast, under Evid.R. 702, a witness may testify as an expert when "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and] (C) The witness' testimony is based on reliable scientific, technical, or other specialized information." Stated simply, expert testimony "must be needed, the proposed expert must be qualified as an expert on the pertinent subject matter, and, even if qualified, the particular testimony must be based on 'reliable' information." *State v. Rosas,* Montgomery App. No. 22424, 2009-Ohio-1404, ¶34. An expert's opinion must be based upon facts or data perceived by the expert or admitted in evidence in the hearing. Evid. R. 703. "The expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise." Evid.R. 705.

{¶ 42} A trial court has considerable discretion in admitting opinion testimony.

*State v. Kehoe* (1999), 133 Ohio App.3d 591, 603 (discussing lay witness opinion testimony).

{¶ 43} In the present case, the trial court characterized Alexander's testimony regarding the flow of water at the Celina facility as a lay opinion. However, Alexander did not investigate the discharge at the Celina facility, and she had no first-hand knowledge of the land application of manure, the condition of the fields upon which manure was applied, the presence of manure in the water in Crab Branch and the Wabash River, or the presence of manure in drainage tiles. Alexander indicated that she had reviewed State's Exhibit 18 and had heard the testimony of all of the witnesses; her knowledge of the discharge at the Celina facility in 2006 appeared to be based solely on that information. Alexander failed to satisfy the first criteria of Evid.R. 701 and, thus, her testimony regarding the flow of water at the Celina field did not qualify as a lay opinion.

{¶ 44} Nevertheless, we agree with the trial court's assessment that it did not need expert testimony "for me [the judge] to know that [water] could have come in through a catch basin or it could have come in through a surface access to the tile system." The trial court heard testimony that 250-300 gallons had been applied over an eight to nine-hour period on November 29 and 30, 2006. Officer Garrison testified that he investigated the discharge beginning at 10:00 a.m. on November 30, 2006, that he observed the land application of manure by SLA employees at that time, and that it was raining heavily during his investigation. Garrison saw that liquid was starting to puddle in the field where the manure was being applied and that the field seemed to be saturated or getting saturated. Garrison further

observed water in Crab Branch and the Wabash River that was dark-brown and blackish in color and had an odor of manure, and upon walking upstream, he found a discharge tile with a cement catch basin; the liquid flowing from the tile had the same dark color and the same odor of manure. The water upstream of this location was clear. Due west of the tile was the field where SLA was applying manure. Garrison located a tile receiver in a ditch on the west side of Wabash Road (near the application field) with liquid that was also dark and smelled of manure.

{¶ 45} Rick Wilson of the Ohio EPA and Christine Pence also investigated the Celina facility on November 30, 2006, due to the report of a discharge. They also noticed a strong odor of manure at a tile receiver downstream of the application field; the water sample was dark brown. Pence testified that, according to the National Weather Service, 1.85 inches of rain fell on November 30, and 1.26 inches of rain fell on December 1.

{¶ 46} Considering the amount and timing of the land application of manure on November 29 and 30, the saturated condition of application field, the near continuous rainfall on November 30 and December 1, and the presence and odor of manure in the water downstream of the application field, the trial court could have reasonably inferred, even without Alexander's testimony, that manure would continue to be discharged from the field on December 1, 2006. In short, the court had competent, credible evidence from which it could conclude that the discharge occurred on December 1, 2006. The court was not required to find in Defendants' favor merely because the discharge of manure was not directly observed on that

date.

{¶ 47} The second assignment of error is overruled.

IV

{¶ 48} Appellants' third assignment of error states:

{¶ 49} "THE TRIAL COURT ERRED BY DECIDING UNDER COUNT 10 THAT THE NPDES PERMIT PROHIBITED MANURE APPLICATION IF RAIN WAS FORECASTED WITHIN 24 HOURS AFTER COMPLETION OF APPLICATION, WHILE THE PERMIT ACTUALLY PROHIBITED THE COMMENCEMENT OF APPLICATION IF RAIN WAS FORECASTED WITHIN 24 HOURS."

{¶ 50} In Count Ten, the State alleged that Defendants engaged in land application of manure on February 27 and 28, 2007, at the Ansonia facility when the forecast contained a greater than 50 percent chance of precipitation for any individual hour for a period extending 24 hours after the commencement of the land application, contrary to the NPDES general permit. The court found in favor of the State on this claim, stating:

{¶ 51} "*** More specifically, Plaintiff alleges manure distribution when weather conditions, within 24 hours after application, exceeded a 50% probability of precipitation. From the testimony and exhibits [Pl. Exs. 42, 43], the Court finds that the Plaintiff has proven its case by a preponderance of the evidence as to manure distribution on February 28, 2007 because there was a 60% chance of precipitation during the next day and 70% probability the next night. The Defendants did not contest the facts regarding the weather forecast or the spreading of manure. Instead, Defendants claim that the duty to comply was placed on Phoenix Farms

since the manure was provided to Phoenix Farms for distribution on its land and that the distribution occurred at its direction. However, the Court finds that compliance with NPDES permits rests upon the permittee and its representatives who performed the distribution. Plaintiff has proven its case on these allegations against SLA, Rick Kremer, and Neal Kremer. ***"

{¶ 52} In their third assignment of error, Appellants claim that the trial court misinterpreted the requirement in the NPDES permit regarding land application of manure when there is a greater than 50 percent chance of precipitation. They further claim that the court incorrectly found that they had not contested the adequacy of the forecast, and they argue that the State produced no evidence establishing that Appellants failed to satisfy the NPDES requirement.

{¶ 53} As an initial matter, the State argues that Appellants waived these issues on appeal, because they failed to raise these arguments prior to their post-trial brief. The State notes that Defendants responded to its motion for summary judgment on Count Ten, stating, in part: "State Line Agri does not contest the accuracy of the weather forecasts that the State had obtained for March 1, 2007. While rain occurred that day, however, the ponding that Christine Pence observed on Phoenix Farms' field on which SRM had spread manure on February 28, 2007 was not due to rain, but snow melt."

{¶ 54} In response, Appellants agree that they have not contested the weather reports' accuracy. They argue, however, that they contested in their post-trial brief whether the State had proven that they had commenced applying manure within 24 hours of a forecast indicating a likelihood of precipitation. And,

they argue that even if the reports are accurate, as they conceded in their opposition to the State's motion for summary judgment, the reports "simply do not prove a necessary element of the State's case."

{¶ 55} We agree with Appellants that they did not waive these issues. By agreeing to the accuracy of the weather forecasts in their opposition to the State's motion for summary judgment, Appellants did not concede that the land application of manure occurred within the prohibited time period. Accordingly, the State continued to have the burden to prove, as an element of its claim, that the land application of manure occurred when precipitation was forecasted within 24 hours after the commencement of the application. Moreover, at trial, Christine Pence and Rick Wilson testified about the weather forecasts for February 27 and 28, 2007, and March 1, 2007. During Defendants' counsel cross-examination of Wilson, counsel asked Wilson about the forecasts and if State's Exhibit 44 indicated the time of day that the manure was spread on February 28, 2007. (Wilson found that information on State's Exhibit 45.) These questions put the State on notice that Appellants were contesting whether the land application of manure was prohibited by those forecasts.

{¶ 56} Turning to the merits of Appellants' arguments, Paragraph VI(B)(2)(e) of the NPDES permit provides, in pertinent part:

{¶ 57} "Land application *** shall not occur if the forecast contains a greater than 50% chance of precipitation for any individual hour, for a period extending 24 hours after the commencement of land application." (State's Ex. 72, p.19.)

{¶ 58} At oral argument, the State asserted that this provision would be

violated if the land application of manure commenced when a greater than 50 percent chance of precipitation was forecasted on the following day. We disagree with the State's interpretation. Paragraph VI(B)(2)(e) of the NPDES permit explicitly speaks in terms of hours, not calendar days, and specifically prohibits the application if there is more than a 50 percent chance of precipitation in "any individual hour" in the "24 hour" period after the commencement of land application. Accordingly, given the evidence that the land application commenced at 3:15 a.m. on February 28, 2007, the State was required to prove that there was a greater than 50 percent chance of precipitation for any individual hour until 3:15 a.m. on March 1, 2007.

{¶ 59} In finding in favor of the State on Count Ten, the trial court stated, incorrectly, that the State had alleged manure distribution had occurred "when weather conditions, within 24 hours *after the application*, exceeded a 50% probability of precipitation." (Emphasis added.) The court found that the State had proven its claim, relying on the fact that there was 60% chance of precipitation during the next day (March 1) and 70% probability the next night. Such forecasts, however, concerned periods of time after 3:15 a.m. on March 1, 2007, which was the expiration of the 24 individual hours after the *commencement* of the application.

{¶ 60} Appellants argue that the court's finding was against the manifest weight of the evidence. In a civil action, such as this one, the State was required to prove its claims by a preponderance of the evidence. See *State ex rel. Brown v. East Liverpool* (May 6, 1981), Columbiana App. No. 80-C-19. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more

convincing than the evidence which is offered in opposition to it.'" *In re Starks*, Darke App. No. 1646, 2005-Ohio-1912, ¶15, quoting Black's Law Dictionary (6th Ed.1998) 1182.

{¶ 61} The weight to be given the evidence and the credibility of the witnesses are primarily matters for the trier of fact to determine. *In re Guardianship of Smith*, Clark App. No. 09 CA 69, 2010-Ohio-4528, ¶19, citing *State v. DeHass* (1967), 10 Ohio St.2d 230. The court of appeals has an obligation to presume that the findings of the trier of fact are correct. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶24. "This presumption arises because the trial judge [or finder-of-fact] had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' *** 'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" (Internal citations omitted.) Id.

{¶ 62} A trial court's judgment will be reversed only if its factual findings are against the manifest weight of the evidence. *KeyBank Natl. Assn. v. Mazer Corp.*, Montgomery App. No. 23483, 2010-Ohio-1508, ¶36. In the civil context, a judgment will not be reversed by a reviewing court as being against the manifest weight of the evidence if there is some competent, credible evidence going to all the essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, syllabus; *Wilson* at ¶24.

{¶ 63} Upon review of the evidence, we agree with Appellants that the State failed to present competent, credible evidence to support the conclusion that a greater than 50% chance of precipitation was forecasted between 3:15 a.m. on February 28, 2007, and 3:15 a.m. on Thursday, March 1, 2007. The daily forecast attached to SLA's application report indicated that thunderstorms were likely on March 1, with the chance of precipitation being 60%. (State's Ex. 45). The forecast for Coldwater, Ohio, which was included in State's Exhibit 42, provided a more detailed forecast. It stated:

{¶ 64} "Wednesday night [February 28]: A chance of rain showers after 1 am, mixing with snow after 2 am. Mostly cloudy, with a low around 39. Chance of precipitation is 30%.

{¶ 65} "Thursday [March 1]: A chance of rain and snow showers before 8 am, then a chance of rain showers. Mostly cloudy, with a high near 48. Chance of precipitation is 50%.

{¶ 66} "Thursday Night: Showers likely. Mostly cloudy, with a low around 33. Chance of precipitation is 60%."

{¶ 67} Based on the Coldwater forecast, a greater than 50% chance of precipitation did not exist until close to Thursday night. Even accepting that a 60 percent chance of precipitation existed at some time during that day, as indicated in State's Exhibit 45, there is no indication that a greater than 50 percent chance of rain existed near 3:00 a.m. on Thursday, March 1.

{¶ 68} The third assignment of error is sustained.

V

{¶ 69} Appellants' fourth assignment of error states:

{¶ 70} "THE TRIAL COURT ABUSED ITS DISCRETION BY IMPOSING TWO PENALTIES AGAINST THE SAME PERSONS FOR THE SAME PROHIBITION IN TWO PERMITS AGAINST SPREADING MANURE ON FROZEN GROUND AT A RATE EXCEEDING 5000 GALLONS PER ACRE UNDER COUNTS 12 AND 13."

{¶ 71} In Count 12, the State alleged that Defendants violated conditions of the PTO and the Ohio Administrative Code when they applied more than 5,000 gallons of liquid manure per acre on frozen and/or snow-covered ground on February 28, 2007. Count 13 alleged that Defendants applied or caused to be applied more than 5,000 gallons of liquid manure per acre on frozen and/or snow covered ground, in violation of the terms of SLA's NPDES general permit. The court found in favor of the State on both counts as to February 28, 2007, and imposed civil penalties of $2,000 against SLA and Rick Kremer and $200 against Neal Kremer, plus injunctive relief, for each count.

{¶ 72} In their fourth assignment of error, Appellants claim that the court erred in imposing separate penalties for violating the application rate provisions of the PTO and NPDES permits when both permits prohibited the application of manure on frozen land at a rate exceeding 5,000 gallons per acre. Appellants argue that, "[w]hen a defendant has two permits with the same requirement, a violation of that requirement should result in one penalty, not two penalties." They emphasize that the application rate requirements in the two permits have "exactly the same purpose – preventing manure from running off frozen fields – not

separate and distinct purposes."

{¶ 73} The State responds that the statutory framework of both R.C. Chapters 903 and 6111 mandate civil penalties for violations, and that the penalties are directed to different funds with separate purposes. The State emphasizes that the trial court could exercise its discretion in determining the appropriate penalty for each violation.

{¶ 74} R.C. Chapter 6111 is concerned with water pollution control. R.C. 6111.03 authorizes the director of the Ohio EPA to develop plans and programs for the "prevention, control, and abatement of new or existing pollution of the waters of the state." Among those duties, the Ohio EPA has the authority to "issue, revoke, modify, or deny" permits for the discharge of wastes into the waters of the state and to "set terms and conditions of permits, including schedules of compliance, where necessary." R.C. 6111.03(J)(1). Permit terms and conditions are to be designed to "achieve and maintain full compliance with the national effluent limitations, national standards of performance for new sources, and national toxic and pretreatment effluent standards" under the Federal Water Pollution Control Act. Id.

{¶ 75} R.C. 6111.04 imposes a general prohibition against polluting waters of the State. It reads: "No person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state." R.C. 6111.07(A) further provides: "No person shall violate or fail to perform any duty imposed by sections 6111.01 to 6111.08 of the Revised Code, or violate any order, rule, or term or condition of a permit issued or adopted by the director of environmental

protection pursuant to those sections.   Each day of violation is a separate offense."   Any person who violates R.C. 6111.07 "shall pay a civil penalty" of not more than $10,000 per day of violation.   R.C. 6111.09(A).

{¶ 76} Under R.C. 6111.09(B), money collected as civil penalties is divided evenly between two funds.   One-half of the money is credited to the Environmental Education Fund.   The exclusive use of that fund is "to develop, implement, and administer a program to enhance public awareness and the objective understanding within this state of issues affecting environmental quality."   R.C. 3745.22(B).   Money in the fund may be used for developing elementary and secondary school and collegiate curricula on environmental issues; providing training for Ohio's elementary and secondary school teachers on environmental issues; providing educational seminars for the public regarding the scientific and technical aspects of environmental issues; providing educational seminars regarding pollution prevention and waste minimization for persons regulated by the Ohio EPA; providing educational seminars for persons regulated by the Ohio EPA; and providing one or more scholarships in environmental sciences or environmental engineering for students enrolled at an eligible institution of higher education.   Id.

{¶ 77} The remainder of the civil penalty must be credited to the Water Pollution Control Administration Fund, administered by the director of the Ohio EPA.   Money in that fund must be used to supplement other money available for the administration and enforcement of R.C. Chapter 6111 and the rules adopted and terms and conditions of orders and permits issued under it.   R.C. 6111.09(B).

{¶ 78} In 2000, the Ohio General Assembly enacted 2000 S.B. 141, effective

March 15, 2001, to provide for the regulation of concentrated animal feeding facilities (CAFF) and concentrated animal feeding operations (CAFO) and to transfer authority from the Ohio EPA to the ODA to issue permits for the construction and modification of CAFFs and to issue NPDES permits to CAFOs. As a result of that legislation, the director of the ODA was required to develop a program to issue permits to install (R.C. 903.02) and permits to operate (R.C. 903.03). A permit to operate includes a manure management plan that conforms to best management practices regarding the handling, storage, transportation, and land application of manure, as well as an insect and rodent control plan, mortality management plan, emergency response plan, and the operating record requirements.

{¶ 79} R.C. 903.16(C) and (D) authorize the attorney general, upon the written request of the director of the ODA, to bring a civil action against a person who has violated the terms of a PTO. A person who has committed a violation "shall pay a civil penalty" of not more than $10,000 per violation. R.C. 903.16(D)(3). "Each day that a violation continues constitutes a separate violation." Id. All monies collected from civil penalties under these provisions are deposited in the Livestock Management Fund, which is used solely in the administration of R.C. Chapter 903. R.C. 903.19.

{¶ 80} The interplay between R.C. Chapter 903 and R.C. Chapter 6111 is addressed in both chapters. After the ODA program was finalized, authority to issue and enforce permits to install was transferred from the Ohio EPA to the ODA.

R.C. 903.04(B); R.C. 6111.03(J)(1)[2]. R.C. 903.08(A)(1) authorized the director of the ODA to participate in NPDES and to submit the program to the United States EPA for approval. After approval by the United States EPA, the authority to enforce NPDES permits concerning the discharge of manure or storm water from an animal feeding facility would be transferred from the Ohio EPA to the ODA. R.C. 903.08(A)(2); R.C. 6111.03(J)(1). Thereafter, "no person shall discharge manure from a point source into waters of the state without first obtaining a NPDES permit issued by the director of agriculture under this section." R.C. 903.08(B)(1). If an animal feeding facility were required to obtain both a PTO and a NPDES permit, the ODA would issue a single permit to operate incorporating the terms and conditions established by both permits. R.C. 903.08(H). The PTO would be required to expressly "designate the terms and conditions required under the NPDES program as federally enforceable. All other provisions are enforceable under state law only and expressly shall be designated accordingly." Id.

{¶ 81} To date, the United States EPA has not approved the NPDES program submitted by the ODA.

{¶ 82} Upon review of the statutes, we find no basis to conclude that conduct which results in a violation of both the PTO and the NPDES permit should result in one penalty, rather than two. R.C. 903.16(D)(3) and R.C. 6111.09 each require the payment of a civil penalty for violations of the permits issued under the

---

[2] Various provisions of R.C. Chapters 903 and 6111, including R.C. 6111.03(J)(1), were amended, effective December 22, 2009, by Sub.H.B. No. 363.

respective statute. Although the purposes of R.C. Chapters 903 and 6111 – and the permits issued under those statutes – overlap in some respects, the two chapters have different overall goals, and the civil penalties paid under the two chapters are directed, by statute, to specific funds relating to those differing goals. Appellants' assertion that the penalties are duplicative because "both statutes give the money to the State" is an oversimplification of the statutory allocation of the civil penalties. The different goals and penalties are an indication of the legislature's intent as to how environmental protection should be civilly regulated.

{¶ 83} Appellants rely on several cases – *State v. Tri-State Group, Inc.*, Belmont App. No. 03 BE 61, 2004-Ohio-4441; *Atlantic States Legal Found., Inc. v. Tyson Foods, Inc.* (C.A.11, 1990), 897 F.2d 1128; *Cayton v. Safelite Glass Corp.* (Ore.App. 2009), 222 P.3d 1134; and *Morris v. Cactus Drilling Co.* (La.App. 2008), 982 So.2d 957 – to support their assertion that imposing two penalties for the same illegal act is improper. None of these cases is directly on point or controlling, and we do not find them persuasive.[3]

---

[3] *Atlantic States* addressed whether the discharge of a pollutant may be the cause of violations of both daily and monthly discharge limits in a single permit and declined to interpret the federal Clean Water Act to authorize dual fines. *Atlantic States* did not address identical provisions in multiple permits. We further note that other federal circuits have disagreed with *Atlantic States* on this issue. See, e.g., *United States v. Smithfield Foods, Inc.* (C.A.4, 1999), 191 F.3d 516, 527 (concluding that the daily and monthly concentration limits "are included in the Permit for different reasons and serve distinct purposes.")

In *Tri-State*, the appellant argued that the trial court erred in imposing a civil penalty for violating the company's NPDES permit when the permit had expired. The Seventh District concluded that the company was not prejudiced by the assessment of the penalty, because the penalty was supported by violations of the company's permit to install and the trial court had not increased the amount of the penalty due to violations of multiple permits.

*Cayton*, an Oregon case, and *Morris*, a Louisiana case, both concerned penalties under their respective state's workers' compensation statute.

{¶ 84} The fourth assignment of error is overruled.

VI

{¶ 85} Appellants' fifth assignment of error states:

{¶ 86} "THE TRIAL COURT ABUSED ITS DISCRETION BY IMPOSING THREE PENALTIES AGAINST THE SAME PERSONS FOR THE SAME PROHIBITION AGAINST POLLUTING WATERS OF THE STATE UNDER COUNTS 20, 21, AND 22."

{¶ 87} In their fifth assignment of error, Appellants claim that the trial court abused its discretion by imposing penalties for Counts 20, 21, and 22 when the three counts duplicate each other. Appellants incorporate their argument as stated in their fourth assignment of error.

{¶ 88} Initially, we note that Counts 20, 21, and 22 all relate to alleged violations of R.C. Chapter 6111 and the NPDES permit issued pursuant to that statute. In contrast, the fourth assignment of error concerned similar requirements in different permits (PTO and NPDES) issued pursuant to two different statutes (R.C. Chapter 903 and R.C. Chapter 6111). In short, this assignment of error concerns duplication within one statutory scheme whereas the fourth assignment of error concerned the overlapping requirements of two statutory schemes. The issues presented in this and the fourth assignments of error are not identical.

{¶ 89} Counts 20, 21, and 22 are closely related. Count 21 alleged that Defendants discharged liquid manure into waters of the State and caused discoloration of the water on February 27 and 28, and March 1, 2007, in violation of R.C. 6111.04, R.C. 6111.07, and Ohio Admin. Code 3745-1-04(C). R.C. 6111.04

prohibits a person from causing pollution or causing any wastes to be placed in a location where they cause pollution of any waters of the state, except in accordance with the terms of an NPDES permit.[4] Ohio Administrative Code 3745-1-04(C) states that waters of the State shall be free from materials entering the waters as a result of human activity producing color, odor, or other conditions in such as degree as to create a nuisance. R.C. 6111.07 prohibits persons from violating or failing to perform any duty imposed under R.C. 6111.01 to 6111.08 or from violating "any order, rule, or term or condition of a permit issued or adopted by the director of environmental protection pursuant to those sections."

{¶ 90} Counts 20 and 22 concern two alleged violations of the SLA's NPDES general permit. Count 20 alleged that manure was discharged into waters of the

---

[4]Specifically, R.C. 6111.04 stated, in relevant part:

"(A) Both of the following apply except as otherwise provided in division (A) or (F) of this section:

"(1) No person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state.

"(2) Such an action prohibited under division (A)(1) of this section is hereby declared to be a public nuisance.

"Divisions (A)(1) and (2) of this section do not apply if the person causing pollution or placing or causing to be placed wastes in a location in which they cause pollution of any waters of the state holds a valid, unexpired permit, or renewal of a permit, governing the causing or placement as provided in sections 6111.01 to 6111.08 of the Revised Code or if the person's application for renewal of such a permit is pending.

"***

"(C) No person to whom a permit has been issued shall place or discharge, or cause to be placed or discharged, in any waters of the state any sewage, sludge, sludge materials, industrial waste, or other wastes in excess of the permissive discharges specified under an existing permit without first receiving a permit from the director to do so."

State on February 27 and 28, and March 1, 2007, due to land application of manure, which was not done in compliance with a manure management plan, contrary to Part III(A)(2)(c) of SLA's NPDES general permit. Part III(A)(2)(c) of the NPDES permit provides:

{¶ 91} "There shall be no discharge of pollutants to waters of the State from land applied manure except for discharges that are composed of storm water runoff and/or snow melt runoff originating from a land area where manure from a CAFO has been applied in compliance with the manure management plan and this permit."

{¶ 92} In Count 22, the State alleged that the land application of manure caused ponding and runoff to waters of the State on February 27 and 28 and March 1, 2007, contrary to Part VI(B)(2)(d) of SLA's NPDES permit. Part VI(B)(2)(d) of SLA's NPDES permit reads:

{¶ 93} "Land application of manure shall not cause ponding or runoff. For liquid manure applications, the application shall not exceed the available water capacity in the upper eight inches of the soil in the application field."

{¶ 94} The State fully described the land application of manure on February 27 and 28 in Count Nine of its complaint, which alleged that Defendants' conduct had violated the PTO. Part III(A)(2)(c) [Count 20] and Part VI(B)(2)(d) [Count 22] are not identical provisions. One prohibits discharges to waters of the State while the other prohibits ponding and runoff. For example, there could be ponding without runoff and there could be runoff without ponding. The trial court appropriately treated Counts 20 and 22 as separate and distinct, and it did not

abuse its discretion in awarding civil penalties for each violation.

{¶ 95} Counts 20 and 21 both alleged that Appellants discharged manure into waters of the State. Count 20, however, focused on Defendants' failure to comply with the manure management plan, in violation of SLA's NPDES permit. Count 21 alleged that the discharge violated the Revised Code and Ohio Administrative Code. In addition, Count 21 included an additional allegation that the discharge caused a portion of the tributary of the Stillwater River to be discolored; the State's evidence supported the trial court's conclusion that manure was discharged into waters of the State and that the discharge caused discoloration of the tributary. Accordingly, we disagree with Appellants' characterization that the trial court imposed three penalties for the same prohibition against polluting waters of the state.

{¶ 96} The fifth assignment of error is overruled.

VII

{¶ 97} Appellants' sixth, seventh, and eighth assignments of error state:

{¶ 98} "THE TRIAL COURT ERRED BY FINDING LIABILITY UNDER COUNT 20, BECAUSE THERE IS NO EVIDENCE THAT MANURE SPREAD ON SLA'S FIELD AND PHOENIX FARMS' FIELD ON FEBRUARY 27 AND 28, 2007 WAS DISCHARGED INTO WATERS OF THE STATE ON THOSE DAYS.

{¶ 99} "THE TRIAL COURT ERRED BY FINDING LIABILITY AND ASSESSING PENALTIES UNDER COUNT 21, BECAUSE THERE IS NO EVIDENCE THAT MANURE WAS DISCHARGED INTO WATERS OF THE STATE ON FEBRUARY 28, 2007.

{¶ 100} "THE COURT ERRED BY FINDING LIABILITY AND ASSESSING PENALTIES UNDER COUNT 22, BECAUSE THERE IS NO EVIDENCE THAT MANURE WAS DISCHARGED INTO WATERS OF THE STATE ON FEBRUARY 28, 2007."

{¶ 101} In their sixth, seventh, and eighth assignments of error, Appellants claim that the trial court erred in finding that they discharged manure into waters of the State on February 28, 2007.

{¶ 102} At the conclusion of the trial, Defendants moved for a directed verdict on several counts, including Counts 20, 21, and 22. Defendants argued that there was no evidence of a discharge of pollutants into waters of the State on February 27 and 28. The court entered a directed verdict in favor of Defendants on Counts 20, 21, and 22 with respect to February 27, but not February 28.

{¶ 103} In its decision and entry, the trial court found regarding Count 20 as follows:

{¶ 104} "This Count again concerns conduct that occurred on February 27 and 28, 2007. Based on the Court's prior findings that manure waste spilled off the land and into waters of the state, the Court necessarily finds that the NPDES permit was also violated. The Plaintiff has proven this allegation by a preponderance of the evidence against SLA, Rick Kremer and Neal Kremer. ***"

{¶ 105} The trial court's findings concerning Count 21 read:

{¶ 106} "This Count again concerns conduct that occurred on February 27 and 28, 2007. Based on the court's prior findings that manure waste spilled off the land and into waters of the state on February 28, 2007 and March 1, 2007, the

Court necessarily finds that R.C. 6111.07 and OAC 3745-1-04(C) were violated. [The NPDES permit is based on these codified laws.] ***"

{¶ 107} Finally, the court found as to Count 22:

{¶ 108} "This Count again concerns conduct that occurred on February 27 and 28, 2007. The Court previously determined that manure run-off occurred and that manure entered waters of the state on February 28, 2007. The Court specifically finds, based on the testimony and photographic evidence [Pl. Exs. 38A-38H], that there was run-off and ponding of the liquified manure. ***"

{¶ 109} Appellants argue that the trial court erroneously found in Count 20 that a discharge had occurred on February 27, 2007. It is true that the decision is somewhat ambiguous due to the court's reliance on its "prior findings," which included, as stated in its discussion of Count Nine, that SLA and SLRM had "failed to follow regulations regarding spreading manure on *both tracks* of frozen fields," including "failing to prevent ponding and runoff." Such language implies that violations occurred on February 27, 2007.

{¶ 110} Nevertheless, the trial court had granted a directed verdict to Defendants on the State's allegations of a discharge on February 27, 2007, and Count 20 does not specifically find that a violation occurred on February 27, 2007. Moreover, the trial court's treatment of Counts 21 and 22 indicates that the discharges occurred on February 28 and March 1. Accordingly, it is apparent that the reference to February 27, 2007 (as opposed to March 1, 2007) was a typographical error, and we do not read the trial court's decision as making a finding that a discharge occurred on February 27, 2007.

{¶ 111} Appellants' primary argument is that the trial court's finding that a discharge had occurred on February 28, 2007, was against the manifest weight of the evidence. The evidence at trial established that, between 3:15 a.m. and 2:00 p.m. on February 28, 2007, Roman Kremer applied 201,101 gallons of liquid manure to a 36-acre soybean field owned by John Labig (operating as Phoenix Farms). The land was located across State Route 118 from SLA's fields. At the time, the field was frozen four inches, had one to two inches of snow cover, and was 75 percent saturated. (State's Ex. 45.) Because the ground was frozen and/or snow covered, the land application of manure should have been limited to the rate of 5,000 gallons per acre; Roman Kremer applied manure at a rate of 5,586 gallons per acre. The manure was applied on top of the ground; it was not incorporated into the soil. Christine Pence testified when manure is spread on the ground and then precipitation or snow melt is added to it, "it's natural to expect that the manure is going to be in the water that's on the field." (Tr. 398) She further testified that, if the manure were applied "at a heavier rate" and the ground were already saturated with liquid, ponding would result. (Tr. 399.)

{¶ 112} Kyle Stegall, an employee of SLA and SLRM in 2007, testified for Defendants that he was asked by Roman or Neal Kremer to be the "field monitor" on February 28. Stegall monitored the creeks, tiles, and boundaries from early morning through the completion of the land application, as well as several hours after the application was completed. Stegall did not observe any discharge of manure. Roman Kremer likewise testified that he did not observe any ponding or runoff on February 28.

{¶ 113} According to the State's weather data, the temperature rose from below freezing (approximately 28 degrees) in the early morning to near 45 degrees by early afternoon on February 28; SLA reported the temperature at 3:15 a.m. to be 25 degrees. By 6:00 p.m., the temperature had dropped to just above freezing, and it remained at approximately 34 degrees for the rest of the calendar day. No rain fell on February 28.

{¶ 114} Christine Pence testified that around 4:00 p.m. on March 1, 2007, she was driving home from conducting an inspection of another facility when she noticed equipment tracks around the manure storage pond at SLA's Ansonia facility and in the field. The tracks caused her to question whether SLA was doing land application of manure. Pence stopped at SLA's office on SR 118 and spoke with Rick Kremer and Rich Fisher. When Pence informed the men that she had noticed the tracks, they said they had just applied over 200,000 gallons of manure to the field behind the facility and across the road. Kremer and Fisher told her that manure levels were high and they needed to get manure out and they felt it was a good time since the ground was frozen. Pence requested copies of SLA's application records; Fisher sent Pence a letter on March 2, 2007, which summarized the application events and included weather forecasts, documentation, and a summary of the amount of manure applied (State's Ex. 45).

{¶ 115} After talking with Kremer and Fisher, Pence investigated the soybean field. Pence saw that the soybean field had been "fall chiseled" (i.e., plowed after harvest with a chisel plow), and it was difficult to see any crop residue in the field. She observed that the ground was frozen with a thin layer of mud on top; there was

still some snow cover on the field. It was raining "pretty heavily," and there "was a lot of water flowing through the field." Pence testified that the flowing water was approximately 12 to 15 inches deep and, in the location depicted in State's Exhibit 38E, was approximately 30 feet across. Pence indicated that the water was concentrated runoff due to rain and snow melt. Pence's follow-up letter to SLA stated that "it had just begun to rain while I was at this location, at approximately 5:00 p.m., but there was already a significant amount of runoff occurring from the application field ***."

{¶ 116} Pence further testified that liquid with a strong odor of manure was ponding in the field. The ponding was due to the combination of snow melt and the manure application. On cross-examination, Pence acknowledged that she had not observed the field on February 28, that she had no evidence that ponding occurred after application, and that there was no evidence that ponding would have occurred absent snow melt.

{¶ 117} On March 1, 2007, the temperature rose from approximately 34 degrees to near 50 degrees by early afternoon, and the temperature remained in the 40s throughout the rest of the calendar day. Light rain fell, with a brief lull, from 6:00 a.m. until shortly after noon, and again from approximately 2:45 p.m. until approximately 3:30 p.m. Heavier rain fell between 5:00 p.m. and 9:00 p.m. A total of 1.04 inches of rain fell on March 1.

{¶ 118} The trial court did not specify the evidence upon which it had relied in determining that a discharge occurred on February 28. The State asserts, in essence, that the above-freezing temperatures coupled with the excessive

application rate on February 28 prove that the ponding, discharge, and runoff began on that date. The State further asserts that the morning rain on March 1 played a limited role in causing the discharge, considering that the heavy rainfall occurred after 5:00 p.m. on March 1. The State argues that the discharge was caused primarily by the melting snow and thawing that occurred on both February 28 and March 1, 2007.

{¶ 119} There was substantial evidence that the February 28 land application resulted in ponding and runoff on March 1, 2007. However, we do not find that there was competent, credible evidence to support the trial court's conclusion that a discharge of manure into waters of the State also occurred on February 28.

{¶ 120} At the outset, we emphasize that the trial court was not required to credit the testimony of Stegall and Roman Kremer that they did not observe any discharge from the application field. Moreover, the State was not required to supply direct evidence by way of eyewitness testimony that a discharge occurred on February 28 in order to refute that testimony.

{¶ 121} Nevertheless, the State's evidence must have been sufficient to support a reasonable inference that a discharge occurred. At stated above, the State relied primarily on evidence that the temperature on February 28 was above-freezing for most of the day and that Defendants had applied an excessive amount of liquid manure on the snow covered and frozen land. These facts reasonably suggest that some of the snow would have melted, causing the manure to mix with snow melt, but there is no evidence that a run-off stream and discharge to waters of the State resulted on February 28. The temperature on March 1 never

fell below freezing and was significantly warmer than on February 28. Moreover, unlike February 28, rain fell throughout the day on March 1. Although Pence testified that excessive manure combined with snow melt and precipitation would cause ponding on saturated ground, there was no expert testimony to explain whether the excessive manure application and snow melt on February 28 was likely to have caused the run-off to begin on that date, given the rising and falling temperatures and lack of precipitation. Similarly, there was no expert testimony to explain why the significant run-off stream that was depicted in Pence's photographs likely would not have begun on March 1, given the precipitation and higher temperatures on that date. The trial court's conclusion that the discharge began on February 28 was based on speculation that the snow melt on February 28, coupled with the excessive manure application, was substantial enough to cause a runoff stream that discharged into waters of the State.

{¶ 122} The sixth, seventh, and eighth assignments of error are sustained.

VIII

{¶ 123} Appellants' ninth assignment of error states:

{¶ 124} "THE COURT ERRED BY FINDING LIABILITY UNDER COUNT 23 FOR FAILING TO PROVIDE MANURE ANALYSES TO THIRD PARTIES TO WHOM THE MANURE WAS GIVEN, BECAUSE THIS REQUIREMENT DOES NOT APPLY WHEN THE PERMITTED FARM IS RESPONSIBLE FOR THE MANURE'S APPLICATION."

{¶ 125} In their ninth assignment of error, Appellants claim that the trial court erred in finding that SLA, Rick Kremer, and Neal Kremer had failed to provide

manure analyses to third parties, as required by the Manure Management Plan in SLA's PTO.

{¶ 126} The Manure Management Plan portion of SLA's PTO specifically states that it would use the "distribution and utilization" method of manure management. "Distribution and utilization" involves the distribution of manure to others outside the control of the permitted owner or operator and any employees of the facility. (See Tr. at 140, 659.) An owner has control over the land application if the owner applies manure on land it owns, if the owner performs the manure application on another's land, or if owner dictates the rate and timing of manure application. (Tr. at 140, 660.) In short, the distribution and utilization method would not allow for land application by the owner of the facility.

{¶ 127} When manure is given or sold to another farmer under the distribution and utilization method, the recipient is responsible for determining when the manure is applied, how much is applied, and the conditions of which it is applied. (Tr. at 660). The facility providing the manure then has the responsibility to document who took the manure, how much was taken, when it was taken, and the fact that the farmer received a manure analysis and the land application restrictions. (Id.)

{¶ 128} SLA's PTO states that it uses distribution and utilization by "giving manure to another farmer." It indicates that SLA hires custom applicators for land applying liquid manure, and that it does not own any application equipment. In addition, the PTO stated that all manure is exported to others, and that applications of lime, other fertilizers, and other soil amendment decisions would be made by the

farmers receiving SLA's manure through sale or gift from SLA. The PTO further provided:

{¶ 129} "If manure is to be managed through Distribution and Utilization then the owner or operator shall receive a written agreement signed by the person accepting the manure that states: '*I have been provided with a copy of analytical results that list the nutrient content of the manure and total quantities of manure. The manure will be distributed and utilized according to the best management practices and according to any state laws regulating these uses.*' Rule 901:10-1-11"   (State's Ex. 2, p.65)(emphasis in original.)

{¶ 130} In Count 23, the State alleged that SLA and Rick Kremer failed to provide recipients of manure with nutrient analyses related to the manure and that SLA failed to receive written agreements from manure recipients acknowledging receipt of the analytical results.   The State subsequently moved for summary judgment for failure to provide manure analyses to manure recipients and obtain written agreements acknowledging receipt of the analyses on February 28, March 30, April 9-10, July 3, August 7-8, August 11, August 15, and  November 5-6, 2007.

{¶ 131} The trial court granted summary judgment to the State on this Count.  The court reasoned: "While the Defendants may have entered into manure distribution agreements which permitted manure distribution on their [i.e., others'] land, these agreements are not the same as acknowledged receipt of the nutrient analysis information.   There is no dispute of material fact in this regard.   The Court determines that Defendants failed to obtain the signed acknowledgments and failed

to maintain the acknowledgments in the operating records. Plaintiff is entitled to summary judgment on this issue. The question of damages and civil penalties, if any, is reserved for the Court's determination at trial."

{¶ 132} In its post-trial decision and entry, the trial court acknowledged its prior grant of summary judgment and assessed civil penalties against SLA, Rick Kremer, and Neal Kremer.

{¶ 133} Appellants assert that the trial court erred in finding them liable for failing to provide manure analyses when the court had determined that SLA controlled the land applications performed by Neal and Roman Kremer. They argue that the finding of liability for failing to provide manure analyses was inconsistent with the finding that SLA controlled the land application of manure. Appellants further argue that the court erred in assessing a penalty of $100 against Neal Kremer when he was not named in Count 23 of the complaint.

{¶ 134} The State acknowledges that its claims in Counts 9 through 22 related to the land application of manure on February 28, 2007, conflict with its claim in Count 23 for failure to provide manure analyses to another farmer on that date. The State further concedes that they did not seek a penalty against Neal Kremer. The State argues, however, that there was ample evidence to support the conclusion that SLA managed its manure through distribution and utilization after February 2007.

{¶ 135} In its decision and entry, the trial court found that SLA and Rick Kremer controlled the land application of manure on February 28, 2007. In addressing Count Nine, the court expressly rejected Defendants' argument "that

SLRM acted in its sole judgment to spread the manure since the operations are so closely related, there was proof of dual employment of Neal Kremer by SLRM and SLA, the ownership of 6 acres by SLA and the obligation of SLA to comply with regulations." Discussing the scope of Neal Kremer's liability generally, the court further stated:

{¶ 136} "Neal Kremer conducted the manure distribution in February, 2007 at two locations near Ansonia (the 36 acre tract and the 6 acre tract). Since the articles of organization for SLRM as a limited liability company were not filed until September, 2007, he was acting as an individual contractor for SLA under the business name of SLRM. [Pl. Exs. 94A-94D, 95.] Since SLRM was not organized until after the events involved herein, SLRM is not responsible for the actions of Neal Kremer prior to its organization. By operating SLRM in a regulated business such as agricultural manure management, Neal Kremer held himself out as being qualified and competent to conduct manure distribution practices as required by law. Accordingly, the Court finds that Neal Kremer is determined to be responsible for any violations of statutory and administrative codes for his conduct in February, 2007. (Counts IX to XIII, XV, XVIII to XXIII). R.C. 6111.07."

{¶ 137} The trial court did not find through these statements that Neal Kremer had land applied manure at the direction of SLA or Rick Kremer after February 28, 2007, and there are no specific findings elsewhere in the decision and entry regarding whether SLA or Rick Kremer controlled the land application of manure after that date. In finding in favor of the State on Count 23, the court implicitly found that, after February 28, 2007, SLA no longer controlled the land application of

manure by Neal Kremer.

{¶ 138} The parties presented substantial evidence concerning SLA's control of SLRM's land application of manure. According to Pence's testimony at trial, SLA had no records of manure removal by distribution and utilization after April 19, 2006. (Tr. at 349, State's Ex. 47) The 2007 manure removal records indicated that manure was removed from SLA on February 27, February 28, March 30, April 9, April 10, July 3, 2007, November 5, and November 6. Pence believed "that it was being removed by the facility and land applied under the control of the facility;" her inspection reports for the July and December 2007 inspections of SLA noted the dates of manure removal and the number of acres on which the manure was applied and that SLA had purchased manure application equipment. (Id. at 348-49.)

{¶ 139} SLA's records contained no written agreements from recipients. Pence testified that SLA's records indicated that the February 27 and 28 removal of manure was performed by SLA. Roman Kremer testified that his father (Rick Kremer) and Rich Fisher had asked him to land apply manure from SLA onto others' lands. The parties presented evidence of payments for work for SLRM by check from SLA, Neal Kremer's insurance documentation, loan documentation, and conversations and e-mail communications from SLA to ODA inspectors, all of which related to the relationship between SLA and SLRM. Suffice it to say, there was extensive support for the trial court's conclusion that SLA controlled the land application of manure on February 28, 2007, notwithstanding Neal Kremer, Rick Kremer, and SLA's evidence and claims to the contrary.

{¶ 140} Pence further testified, however, that SLRM's records concerning manure removal and land application began on March 30, 2007. (State's Ex. 96.) SLRM has customers other than SLA, and Neal Kremer testified that the landowner usually tells SLRM the application rate to use. There was no direct testimony as to whether SLA or Rick Kremer directed SLRM's activities regarding the land application of SLA's manure after February 28, 2007, notwithstanding Neal Kremer and Roman Kremer's dual employment with SLA and SLRM.

{¶ 141} Despite the conflicting evidence, the record supports a conclusion that SLA managed its manure through distribution and utilization after February 28, 2007. SLRM, not SLA, prepared records of its land application of SLA's manure beginning on March 30, 2007. The trial court could have reasonably concluded that SLA controlled the land application of manure on February 27 and 28, but that SLA's control did not continue indefinitely. This is particularly true for the November 2007 manure removals, which occurred after SLRM had incorporated; the fact that SLRM was a separate corporate entity in November 2007 supports the conclusion that Roman Kremer and Neal Kremer were not acting as employees of SLA when they applied manure for SLRM at that time.

{¶ 142} The ninth assignment of error is sustained as to the land application on February 28, 2007, and as to the assessment of civil penalties against Neal Kremer. In all other respects, the assignment of error is overruled.

VIII

{¶ 143} Appellants' tenth assignment of error states:

{¶ 144} "FOR COUNT 9, THE TRIAL COURT ERRED BY PENALIZING THE

DEFENDANTS TWICE FOR THE SAME VIOLATIONS UNDER THE SAME LEGAL THEORIES, AND BY PENALIZING THE DEFENDANTS FOR VIOLATIONS THAT THE TRIAL COURT FOUND DID NOT OCCUR."

{¶ 145} In their tenth assignment of error, Appellants claim that the trial court's assessments of penalties for Count Nine were erroneous in three respects: (1) the trial court double counted the violations in Counts 12 and 18 and assessed penalties twice for the same violation; (2) the trial court assessed penalties in Count Nine for violations that it found did not exist in Counts 14 and 16; and (3) the court assessed penalties to address information allegations in Count Nine that were not alleged to violate any legal requirement. Appellants assert that $22,000 in penalties has no basis or justification.

{¶ 146} We begin with a discussion of the scope of Count Nine as alleged and the trial court's ruling on that count.

{¶ 147} Count Nine concerned the land application of manure on February 27 and 28, 2007. The allegations therein included the manure management requirements under SLA's PTO and the land application of manure requirements in Ohio Administrative Code Chapter 901. Count Nine detailed the circumstances surrounding the February 27 and 28 land application of manure, including the condition of the soil, information about notices given by ODA LEPP inspectors to SLA regarding the need for prior approval before land application on frozen and/or snow covered ground, the weather forecast and actual rainfall on the relevant dates, and how the manure was applied. The State alleged the following wrongful conduct:

{¶ 148} "129.   Defendant State Line, Defendant Rick Kremer, Defendant Fisher, Defendant Roman Kremer, or Defendant Neal Kremer did not request or receive prior approval from the ODA Director or the ODA Director's representative before applying manure on frozen and/or snow covered ground on February 27 and 28, 2007.

{¶ 149} "130.   On or about February 27 and 28, 2007, the fields where liquid manure was surface land applied discussed in Paragraphs 126 and 127 above had less than 80% residue cover on it.

{¶ 150} "131.   Defendant State Line, Defendant Rick Kremer, Defendant Fisher, Defendant Roman Kremer, and Defendant Neal Kremer did not monitor the application fields and tile outlets at the conclusion of the land application of manure and periodically thereafter on February 27 and 28, 2007.

{¶ 151} "***

{¶ 152} "134.      Defendant State Line, Defendant Rick Kremer, and Defendant Fisher did not notify the ODA within twenty-four hours following the discharge of liquid manure to waters of the State from the Ansonia Facility.

{¶ 153} "135.   Defendant State Line, Defendant Rick Kremer, and Defendant Fisher did not file an adequate written report with the ODA within five days following first hand knowledge of the discharge event.

{¶ 154} "136.   Defendant State Line, Defendant Rick Kremer, and Defendant Fisher did not notify the Ohio EPA within two hours following detection of the discharge of manure to waters of the State.

{¶ 155} "137.   Defendant State Line, Defendant Rick Kremer, and Defendant

Fisher did not submit a written report with the Ohio EPA, Central Office, Division of Surface Water within the fourteen days of the discharge event.

{¶ 156} "138.  In violation of Ohio Adm. Code 901:10-1-10, and the terms and conditions of PTO No. STA-0001.PO001.DARK, Defendant State Line, Defendant Rick Kremer, Defendant Roman Kremer, Defendant Fisher, and Defendant Neal Kremer caused manure to be disposed of on February 27 and 28, 2007 by land application and not distribution and utilization.

{¶ 157} "139.  The conduct alleged in this Count constitutes violations of Ohio Adm. Code 901:10-1-10, and the terms and conditions of PTO No. STA-0001.PO001.DARK, for which Defendant State Line, Defendant Rick Kremer, Defendant Roman Kremer, Defendant Fisher, and Defendant Neal Kremer are subject to injunctive relief pursuant to R.C. 903.16, and for which these Defendants are liable to pay the State of Ohio civil penalties of up to ten-thousand ($10,000) dollars for each day of each violation."

{¶ 158} Counts 10 through 22 of the State's complaint incorporated the facts alleged in Count 9.  These additional counts addressed the specific instances of misconduct, such as the lack of prior approval, excessive application rate, the deficient residue cover, lack of monitoring, and failure to properly notify and submit written reports.

{¶ 159} In seeking summary judgment, the State interpreted Count Nine narrowly.  It stated that Count Nine concerned Defendants' "failure to obey the PTO requirements for distribution and utilization," alleged in paragraph 138 of the complaint.  The motion contrasted "distribution and utilization" from "land

application" and argued that land application is unavailable to an owner or operator who chooses distribution and utilization. The State did not address any of the procedures by which Defendants had land applied the manure as part of Count Nine. In its summary judgment decision, the court found genuine issues of material fact existed as to whether distribution and utilization was used on February 28, 2007. (Because the manure was land applied to SLA's lands on February 27, 2007, the court granted summary judgment to the State and against SLA as to the use of the land application method on that date.)

{¶ 160} In its post-trial brief, the State again confined its arguments to whether SLA managed its disposal of manure through distribution and utilization or land application. After extensive discussion of the evidence at trial, the State argued: "For the reasons addressed above, Defendants have violated the terms and conditions of the PTO requiring distribution and utilization by controlling land application of manure for two independent reasons: Defendant State Line Agri, Inc. employees conduct[ed] the land application and Defendants controlled the timing and amount of manure applied."

{¶ 161} In the decision and entry following trial, the trial court interpreted Count Nine broadly, stating that the State had alleged that Roman Kremer spread manure from SLA on two tracts of land and "committed the following violations:" an excessive distribution rate, failure to monitor drainage, application of manure when prohibited by the weather forecast, failure to prevent ponding and run-off, failure to timely notify regulators after pollution ran-off the field into waters of the State, and failure to provide written reports of the incident. As quoted above, the trial court

found, in part,

{¶ 162} "The testimony and exhibits [Pl. Exs. 37-45] demonstrate that SLA and SLRM failed to follow regulations regarding spreading manure on both tracks of frozen fields, including spreading excessive quantities of manure on frozen fields with low residue cover, failing to prevent ponding and run-off, failing to comply with weather restrictions, failing to monitor, failing to timely notify regulators after the run-off, and failing to timely provide written reports. Plaintiff has proven its case on these allegations against SLA, Rick Kremer and Neal Kremer. ***" The court assessed fines of $10,000 for each day (February 28, 2007, and March 1, 2007) against SLA and Rick Kremer, and fines of $1,000 for each day against Neal Kremer.

{¶ 163} The State argues that the court's aggregate $22,000 fine was directed solely to Defendants' unauthorized use of land application rather than distribution and utilization. The State notes that the court imposed the maximum penalty of $10,000 per day for each application against SLA and Rick Kremer, indicating that the court awarded only a single penalty for using an improper method of manure management.

{¶ 164} We disagree. The trial court's discussion of Count Nine does not specifically mention the failure to use distribution and utilization. Rather, it speaks of failing to follow the regulations regarding the spreading of manure and gives the specific instances of misconduct (e.g., excessive application rate) as the alleged "violations." In addition, in other portions of the decision and entry, the trial court indicates that it had found that several regulation violations had occurred in Count

Nine. For example, in discussing Counts 18 and 19, the court stated that regarding "Count IX, the Court determined that excessive manure was distributed on a 36 acre tract on February 27 and 28, 2007."[5]   Counts 20 to 22 refer to the court's "prior findings" that manure had spilled off the 36 acre tract into waters of the State.   In short, the language of the decision and entry reflects that the court's findings as to Count Nine included the specific instances of misconduct alleged in other counts.   We cannot assume that the trial court's monetary assessment was limited to Defendants' use of land application rather than distribution and utilization.

{¶ 165} Appellants argue that the trial court "double counted" the violations in Counts 12 and 18.   Count 12 alleged that Defendants exceeded the application rate in the PTO when they land applied manure on February 28, 2007.   Count 18 alleged that Defendants failed to properly notify the ODA and file a written report after the 2007 discharge.   The court found in favor of the State on both of these Counts and assessed fines of $2,000 against SLA and Rick Kremer and $200 against Neal Kremer for each count.   We agree with Appellants that the trial court's findings in Count Nine duplicate those in Counts 12 and 18.

{¶ 166} Appellants also argue that the court assessed civil penalties under Count Nine for violations that it found did not exist under Counts 14 and 16.   In discussing Count 14, the trial court stated: "Upon a review of the evidence, the Court is not convinced that the residue cover on the ground was less than 80% on February 28, 2007.   The Defendants prevail on this Count."   (The court did find, as

_____

[5] Because the land application of manure on the 36 acre tract occurred on February 28, we assume that the reference to February 27 was a typographical error.

to Count 15, that there was not at least 90% residue cover on February 28.)   As to Count 16, the court found that the State had "failed to prove its case on this Count regarding monitoring field tiles."   We agree that the specific findings in Counts 14 and 16 are inconsistent with the findings in Count Nine that Defendants' violations included land application of manure on fields with low residue cover and the failure to monitor.

{¶ 167} Further, Appellants argue that the court imposed penalties in Count Nine for violating the weather restrictions, even though Count Nine did not allege that such conduct violated any ODA requirement.   This argument also has merit. Although Count Nine included the weather forecast and actual rainfall as factual background, the Count did not allege that Defendants' land application of manure was improper due to the weather forecast.

{¶ 168} Appellants ask that we reverse the trial court's assessment of $22,000 in fines and remand with instructions to eliminate these $22,000.   We agree that the penalty must be reversed, but will not require the trial court to eliminate these $22,000.   Rather, the trial court must re-determine the appropriate amount of civil penalties for SLA and Rick Kremer's unauthorized use of the land application of manure method of manure management rather than distribution and utilization.   Nothing in this opinion prevents the trial court from reimposing the same $10,000 daily penalty for Count Nine.

{¶ 169} The tenth assignment of error is sustained in part and overruled in part.

IX

{¶ 170} Appellants' eleventh assignment of error states:

{¶ 171} "THE TRIAL COURT ERRED BY FINDING LIABILITY AND ASSESSING PENALTIES AGAINST NEAL KREMER UNDER COUNTS 9, 11, AND 12 EVEN THOUGH THE ATTORNEY GENERAL HAD NO AUTHORITY TO FILE THE LAWSUIT AGAINST HIM."

{¶ 172} In their eleventh assignment of error, Appellants claim that the State lacked authority to bring claims against Neal Kremer, because the Director of the Department of Agriculture authorized an enforcement action only against SLA and Rick Kremer. Appellants argue that the Director's lack of authorization as to Neal Kremer is fatal to the ODA's claims against him. In its brief, the State "does not dispute Appellants' objection to the liability and penalties assessed against Neal Kremer for the ODA Counts 9, 11, and 12." Counts 18 and 23 also involved alleged violations of the PTO and/or Ohio Admin. Code Part 901, which are enforced by the ODA. The penalties for all of those counts totaled $2,700 ($2,000 for Count 9, $200 for Count 11, $200 for Count 12, $200 for Count 18, and $100 for Count 23).

{¶ 173} In light of the State's concession, the eleventh assignment of error is sustained.

X

{¶ 174} The judgment of the trial court will be affirmed in part and reversed in part, and the case will be remanded for further proceedings.

{¶ 175} The following findings will be reversed: (1) that Defendants engaged in land application of manure on February 28, 2007, at the Ansonia facility when the

forecast contained a greater than 50 percent chance of precipitation for any individual hour for a period extending 24 hours after the commencement of the land application, contrary to the NPDES general permit (Count 10); (2) that manure discharged into waters of the State on February 28, 2007 (portion of Counts 20-22); (3) that Defendants failed to provide a manure analysis to recipients of manure on February 28, 2007 (portion of Count 23); and (4) the findings in Count Nine that Defendants' violations included land application of manure on fields with low residue cover (to the extent the court meant less than 80 percent residue on February 28, 2007) and the failure to monitor.

{¶ 176} The civil penalties assessed against Neal Kremer related to the ODA's claims (Counts 9, 11, 12, 18, and 23) in the amount of $2,700 will be reversed.

{¶ 177} The trial court's finding in favor of the State on Count 10 and the civil penalties imposed thereto are reversed.

{¶ 178} In light of our conclusions regarding Counts 9, 20, 21, 22, and 23 of the complaint, the civil penalties for those Counts will be reversed, and the matter will be remanded to the trial court for reconsideration of the appropriate amount of civil penalties for those Counts.

. . . . . . . . . .

DONOVAN, J., concurs.

HALL, J., concurring in part, concurring in judgment in part, and dissenting in part:

{¶ 179} I agree with the majority's analysis and disposition of each

assignment of error except the third and the combined resolution of the sixth, seventh, and eighth assignments of error.

{¶ 180} I agree with the majority's conclusion that the third assignment of error should be sustained but for a different reason.

{¶ 181} I disagree with the majority's analysis and resolution of the sixth, seventh, and eighth assignments of error.

THIRD ASSIGNMENT OF ERROR

{¶ 182} The third assignment of error concerns whether the trial court was correct in determining that the appellant violated the NPDES permit, which specified that "Land application * * * shall not occur if the forecast contains a greater than 50% chance of precipitation for any individual hour, for a period extending 24 hours after the commencement of land application."

{¶ 183} The appellant began application at 3:15 a.m. on February 28, 2007. The forecast on which the appellant relied (part of State Exhibit 45), was a non-hour-specific forecast of a 60% chance of precipitation for Thursday, March 1, 2007. The appellant's own record (also part of State Exhibit 45) indicates that they anticipated a 60 % chance of rain within "24 hours after" the application. That alone could support the trial court's decision on the issue.

{¶ 184} Nevertheless, if the appellant's forecast was for a 60% chance of rain during the daytime on March 1, 2007, a reasonable interpretation of the permit also could be that application during the daytime on February 28, 2007 would be a violation of the "24 hours after the commencement of the land application"

requirement. This would be so if the term "commencement" refers to each individual truckload. In other words, the appellant could apply manure until completion of the last truckload that began spraying before daylight on the 28th, because the forecast on which the appellant relied called for a 60 % chance of rain during the day on March 1st, 24 hours later. The trial court's conclusion that the appellant violated the permit is consistent with that reasonable interpretation of the permit.

{¶ 185} However, I believe the permit language, as applied in this case, is ambiguous. An argument also could be made that the permit language would allow the appellant to commence application at 3:15 a.m. on the 28th and continuously apply manure for days on end, unless it actually rained, because the permit restriction refers to the "commencement" of the application, not the completion of the application. (A separate restriction required the appellant to stop if and when it actually started raining). Because the permit language, as applied in this case, is ambiguous, and because it involves a penalty for a violation, the permit language should be interpreted in favor of the appellant and against the State. In so doing, the record does not support a violation of the permit, and I would therefore sustain the third assignment of error for reasons different than those of the majority.

SIXTH, SEVENTH, AND EIGHTH ASSIGNMENTS OF ERROR

{¶ 186} The majority opinion sustains these related assignments based on its determination that the trial court's conclusion that the appellant caused a discharge into State waters on February 28, 2007, was speculative. The discharge was not observed until Christine Pence arrived on the evening of March 1, 2007. However,

the appellant applied 201,101 gallons of liquified manure to 36 acres of 75% saturated, fall-chiseled field from 3:15 a.m. until 2:00 p.m. on February 28, 2007. Based on the timing, location, temperature, topography, photography, gravity, and the nature of liquid, the trial court reasonably could infer that a discharge into State waters occurred on February 28, 2007,  in addition to the observed March 1, 2007 discharge. I would overrule those assignments of error.

. . . . . . . . . .

Copies mailed to:

Aaron S. Farmer
Margaret A. Malone
Erica M. Spitzig
Jack A. Van Kley
Hon. Jonathan P. Hein